**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ROLAND F. CHALIFOUX, JR., D.O.,

        Plaintiff,

v.                                           Civil Action No. 5:22-cv-0313
                                             Judge John Preston Bailey

WETZEL COUNTY HOSPITAL, INC.;
WEST VIRGINIA UNITED HEALTH SYSTEM, INC.,
d/b/a West Virginia University Health System or
WVU Health System; DONALD BLUM, M.D.;
NIRAJ MOHAN, M.D.; MATTHEW SOKOS, M.D.;
HANY TADROS, M.D.; SEAN SMITH; and
JESSICA HUFFMAN,

        Defendants.

<u>**FIRST AMENDED COMPLAINT**</u>

      COMES NOW the Plaintiff, Roland F. Chalifoux, Jr., D.O. and for his First Amended Complaint for antitrust, sham peer review and violation of due process, defamation, civil conspiracy, and tortious interference against Defendants states as follows:

**I.    INTRODUCTION**

      1.  Plaintiff is an interventional pain management specialist who, for 12 years, was an independent contractor with hospital privileges at Wetzel County Hospital ("WCH"), which is now a wholly-owned subsidiary of Defendant West Virginia United Health System, Inc. d/b/a West Virginia University Health System or WVU Health System ("WVU Health").  In addition to being board

certified by the American Osteopathic Association and the American Board of Interventional Pain, Plaintiff also has held various teaching positions over the years both as a clinical instructor and as an instructor of surgery.  Plaintiff brings this lawsuit to remedy Defendants' malicious and anticompetitive course of conduct over the years following WVU Health's acquisition of WCH, aimed at eliminating competition from Plaintiff – one of few remaining independent physicians specializing in interventional pain management care in the relevant geographic markets alleged here.

2.   Defendants used exclusionary tactics to limit Plaintiff's practice and thus competition from Plaintiff, including by using their control over hospital privileges to restrict the types of procedures Plaintiff could perform in competition with WVU Health employee-physicians, regardless of qualifications and regardless of quality.  Those efforts then culminated in the summary suspension of Plaintiff's hospital privileges at WCH pursuant to Defendants' fictitious claims that Plaintiff supposedly "abused" a patient during a pain pump trial procedure.  Not only did the patient (the supposed victim), who was fully conscious and alert during the procedure, **vehemently deny those allegations in sworn testimony**, but he also expressed anger and frustration with Defendants for their actions against

Plaintiff, which resulted in the patient's inability to proceed with a permanent implant using Plaintiff's services.

3.    After a sham hearing **following** Plaintiff's wrongful summary suspension, lacking even a semblance of a proper "peer review" process, Defendants permanently terminated Plaintiff's privileges at WCH, and maliciously reported it to both the National Practitioner Data Bank ("NPDB") and the West Virginia Board of Osteopathic Medicine ("WVBOM"), which is the relevant state medical licensing board.

4.    Upon its "thorough examination" of the record and a "full review of the matter," WVBOM expressly confirmed what Plaintiff, the patient, and indeed Defendants undeniably knew: that there was "**NO PROBABLE CAUSE** to believe that [Plaintiff] acted unprofessionally or that he has demonstrated a lack of professional competence to practice medicine," and thus "**no basis for disciplinary action against [Plaintiff], for any reason**…."  A true and correct copy of WVBOM's dismissal order is attached hereto as Exhibit A.  There was, in sum, no objectively reasonable basis for Defendants' actions against Plaintiff other than their desire to eliminate competition.

5.    Despite the WVBOM's ruling vindicating Plaintiff, WCH and WVU Health have refused to remove their baseless summary suspension report from the NPDB, which is a data bank that

hospitals and insurance companies throughout the country consult when making decisions, respectively, regarding staffing privileges and malpractice insurance coverage, among others. Indeed, Defendants indicated they would not do so for any reason. Again, the only reason Defendants would do this is to try and eliminate competition.

6.     Plaintiff is unable to practice at any WVU Health hospital due to Defendants' malicious and baseless termination of his privileges. Because many pain management procedures require hospital privileges, Plaintiff cannot perform such procedures without having hospital privileges. Defendants' actions have also jeopardized Plaintiff's ability to obtain privileges at other hospitals within the region, and indeed nationally.  All hospitals are able to see Plaintiff's NPDB suspension report, which has negatively impacted Plaintiff's ability to obtain hospital privileges at any other hospital. Defendants could simply remove the report, which the WVBOM has dismissed as baseless, but because their goal is to eliminate competition, they refuse to do so.

7.     As a direct result of Defendants' exclusionary conduct, The Health Plan of West Virginia, Inc. ("THPWV"), which is a major provider of health insurance coverage in the Ohio Valley, recently terminated its relationship with Plaintiff

solely due to Plaintiff's lack of hospital privileges.  Thus, Plaintiff is currently unable to treat any patients covered under a THPWV health plan, which was exactly in line with what Defendants' exclusionary plan set out to accomplish.

8.    Defendants had full knowledge of the dire ramifications of their unjustified actions against Plaintiff. They also know that the only way to mitigate at least some of the harmful effects of their actions is to remove their baseless summary suspension report from the NPDB, which can be done only in one of two ways:  by their direct action, or with a court order.  Defendants' unreasonable refusal to act has thus necessitated this lawsuit and has resulted in further harm, costs and expense to Plaintiff.

9.    To be clear, Defendants' malicious conduct had nothing to do with any supposed patient "abuse" which the WVBOM determined lacked any probable cause.  Instead, their actions were in furtherance of WVU Health's pretextual plan to eliminate competition between Plaintiff, who is an independent contractor, and WVU Health's employee-physicians in an attempt to obtain or maintain a monopoly in the markets alleged herein.

10.    A basic understanding of how hospitals and physicians receive reimbursements for pain blocking procedures is necessary to put Defendants' actions into perspective.  When

an independent contractor, like Plaintiff, performs a pain-blocking procedure using a hospital's facilities and related services, there are two components to the charges and reimbursement for such a procedure – a professional services fee and a technical services fee.  The professional services fee only covers the cost of the independent contracting physician's services.  The technical services fee covers use of the hospital's equipment, facilities, non-physician medical staff (such as nurses or X-Ray technicians), supplies, and all other services associated with a procedure, but does not include any fees for the physician's professional services.

11.  In such circumstances, an independent provider, such as Plaintiff, and the hospital are reimbursed separately for their respective services.  The independent physician directly receives the fees associated with professional services rendered.  The hospital is reimbursed for its technical services.

12.  In contrast, when a hospital employs the physician who performs a given procedure, as WVU Health generally does, the hospital then collects 100% of the reimbursement for the procedure, including the professional services fee.  The employee-physician who performs the procedure is compensated by the hospital, as any employee would be.

13.   Thus, for every procedure Plaintiff performed at WCH, WCH only received a technical services fee, but WVU Health – which later became WCH's parent - would not receive a professional services fee it otherwise could have collected if one of its employed physicians had performed the procedure instead.  Plaintiff, as an independent contracting physician, therefore competed with WVU Health employee-physicians. Patients always had an option to choose between Plaintiff and a WVU Health employed physician.

14.   Due, in part, to their generally lower overhead, independent providers typically charge lower professional services fees for their pain management services.  Moreover, independent physicians like Plaintiff are subject to a different and lower fee schedule than the fee schedules Hospitals negotiate with various insurance companies.  On information and belief, due to their size and higher bargaining power, hospitals and hospital systems, like WVU Health and WCH, have the ability to negotiate higher fee schedules, including for professional services.  In contrast, because independent physicians like Plaintiff lack the same bargaining power, their fee schedules are lower for the same services.  On information and belief, when a physician who is employed by a hospital performs the same services as Plaintiff (or another independent provider), the

hospital charges higher prices, which is partly due to the hospital's higher overhead costs, and partly due to their ability to negotiate higher fee schedules.

15.  Patients also generally pay higher out-of-pocket costs for services performed by a hospital as opposed to an independent provider (such as an independent laboratory, imaging facility, or other provider that is not part of a hospital system).  A 2016 study published in the American Journal of Managed Care found that "[a]cross product types, such as health maintenance organization, preferred provider organization, or consumer directed health plan, on average, an individual receiving care in an [hospital outpatient department or] HOPD paid between 1.06 and 2.94 times what they would have paid in an [independent physician practice or] PO for that same service." A. Higgins, G. Veselovskiy & J. Schinkel, *National Estimates of Price Variation by Site of Care*, 22-3 AM. J. OF MANAGED CARE e116, at e121 (March 2016).  The study concluded, "This increase in differential was accompanied by shifts in volume of services from less expensive (PO) to more expensive (HOPD) settings.  The resulting additional spending is non-trivial: the price differential between HOPD and PO was associated with $1.9 billion more in healthcare spending for the analyzed 7 services in 2013." *Id*. at e121.  Thus, patients benefit from lower

prices when independent providers are available options, both because of the lower fee schedules and overhead costs of independent providers, and also from competition between physicians.

16.   Accordingly, despite having privileges to perform certain procedures at WCH as an independent contractor, Plaintiff nonetheless competed with WVU Health.  That competition benefited patients by giving them more choices, better quality of care, and better prices for professional services.  For example, in addition to his extensive qualifications, Plaintiff also had a gold star rating with THPWV, which is a program offered by THPWV that "recognize[s] and reward[s] health care practitioners who meet outpatient prior authorization volume and approval criteria by eliminating the outpatient prior authorization process" for certain procedures.  This recognition benefited Plaintiff's patients because they could obtain treatment more quickly by avoiding the time-consuming process for obtaining pre-authorizations which can result in delays.  Plaintiff lost that status after Defendants wrongfully suspended his hospital privileges.

17.   WVU Health became increasingly dissatisfied with this arrangement – and more specifically with having to compete with Plaintiff as an independent contractor for professional

services fees.  Defendants thus took various steps, as alleged herein, culminating in the unreasonable summary suspension of Plaintiff, to limit and ultimately eliminate Plaintiff as a competitor so as to retain for itself the relevant market(s) for pain management care.  Given its dominant market position as further alleged herein, such control has given WVU Health the ability to achieve and/or maintain a monopoly unchecked by competition from independent providers like Plaintiff.

18.  In taking these actions, Defendants knew that WVU Health and WCH did not employ a similarly-qualified physician in Wetzel County.  They also knew that Plaintiff was the only independent pain management physician there with broad qualifications, including advanced surgical training in interventional pain management, and one of very few with such qualifications in the relevant markets defined herein. Defendants nonetheless willfully took actions to eliminate competition from Plaintiff knowing that patients in the area, who needed the services Plaintiff is qualified to provide, would have to travel longer distances - to their physical detriment - to seek treatment from a WVU Health employed physician at a different facility.

19.  The exclusionary conduct alleged herein has harmed (and continues to harm) competition by reducing the supply

of interventional pain management care in the Local Market further described herein, ultimately allowing WVU Health to obtain or maintain more than 70& of the market for interventional pain management care therein, and to also maintain or expand its more than 50% share of the market in the Greater Mid-Ohio Valley Region further described herein.

20.    Plaintiff does not know whether and to what extent Defendants have taken action to try and preclude other types of independent physicians from competing with Defendants' employed physicians.  However, given the small number of interventional pain management specialists (approximately 14 in all of West Virginia), and the existing market power and large market share Defendants already had within this space, Defendants understood that eliminating competition from just a single competitor, specifically Plaintiff, would help secure a monopoly for Defendants.

## II.    PARTIES

21.    Plaintiff Roland F. Chalifoux, Jr., D.O. is an osteopathic physician, specializing in pain management, with his principal place of residence in Belmont County, Ohio, but practicing medicine in Wetzel County, West Virginia.

22.   Defendant WCH is a non-profit domestic West Virginia corporation with its principal place of business in New Martinsville, Wetzel County, West Virginia.

23.   Defendant WVU Health is a non-profit domestic West Virginia corporation with its principal place of business located in Morgantown, Monongalia County, West Virginia.  WVU Health owns and operates at least Defendant WCH; Camden Clark Medical Center in Parkersburg, West Virginia; Reynolds Memorial Hospital in Glen Dale, West Virginia; Barnesville Hospital in Barnesville, Ohio; Harrison Community Hospital in Cadiz, Ohio; Jackson General Hospital in Ripley, West Virginia and Wheeling Hospital in Wheeling, West Virginia - all of which generally fall within the Greater Mid-Ohio Valley Region as defined herein.  On information and belief, this geographic area generally encompasses over 300,000 residents, travelers and tourists.  According to Defendants, "WCH shares WVU[ Health's] purpose" and WVU Health "can assert its control over WCH."  Doc. 16-1 at 19.  Based on these admissions, WVU Health's other wholly owned subsidiaries similarly share in WVU Health's purpose and are similarly subject to WVU Health's control.

24.   Defendant Donald Blum, M.D. is a resident of Wetzel County, West Virginia and a doctor conducting business in Wetzel County, West Virginia.  Defendant Blum is a family

-12-

medicine physician who does not specialize in pain management care. According to Defendants, Defendant Blum is employed by WVU Health, WCH, or another wholly owned subsidiary of WVU Health. Doc. 16-1 at 2. Defendant Blum is thus ultimately employed by WVU Health either directly or through a wholly owned subsidiary.

25. Defendant Niraj Mohan, M.D. is a resident of Wetzel County, West Virginia and a doctor conducting business in Wetzel County, West Virginia. Defendant Mohan is an internal medicine physician, who does not specialize in pain management care. According to Defendants, Defendant Mohan is employed by WVU Health, WCH, or another wholly owned subsidiary of WVU Health. Doc. 16-1. Defendant Mohan is thus ultimately employed by WVU Health either directly or through a wholly owned subsidiary.

26. Defendant Matthew Sokos, M.D. is a resident of Wetzel County, West Virginia and a doctor conducting business in Wetzel County, West Virginia. Defendant Sokos is a family medicine physician who does not specialize in pain management care. According to Defendants, Defendant Sokos is employed by WVU Health, WCH, or another wholly owned subsidiary of WVU Health. Doc. 16-1 at 2. Defendant Sokos is thus ultimately

employed by WVU Health either directly or through a wholly owned subsidiary.

27.   Defendant Hany Tadros, M.D. is a resident of Wetzel County, West Virginia and a doctor conducting business in Wetzel County, West Virginia.  Defendant Tadros is a general surgeon who does not specialize in pain management care. According to Defendants, Defendant Tadros is employed by WVU Health, WCH, or another wholly owned subsidiary of WVU Health. Doc. 16-1 at 2.  Defendant Tadros is thus ultimately employed by WVU Health either directly or through a wholly owned subsidiary.

28.   Defendant Sean Smith is a resident of Wood County, West Virginia, and the President of WCH.  As such Defendant Smith conducts business in Wetzel County, West Virginia.  Defendant Smith is not a physician. Defendant Smith is ultimately employed by WVU Health either directly or through a wholly owned subsidiary.

29.   Defendant Jessica Huffman is a resident of Wood County, West Virginia, and WCH's Assistant Vice President of Clinical Services.  As such Defendant Huffman conducts business in Wetzel County, West Virginia. Defendant Huffman is not a physician.  Defendant Huffman is ultimately employed by WVU Health either directly or through a wholly owned subsidiary.

-14-

30.  At all relevant times, Defendants Blum, Mohan, Sokos, and Tadros were all acting in their capacity as members of the Medical Executive Committee at WCH and in the course of their employment.

### III. <u>JURISDICTION AND VENUE</u>

31.  Plaintiff brings this action for, *inter alia*, damages (including treble damages), injunctive relief, costs of suit, and reasonable attorneys' fees arising under, *inter alia*, Section 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 2, 15 and 26.  This Court has subject matter jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1332, and 1337.  This Court also has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because such claims arise from the same factual nucleus as Plaintiff's federal law claim.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

32.  This Court has personal jurisdiction over each defendant pursuant to, *inter alia*, 15 U.S.C. § 22, as well as Defendants' relevant contacts with this judicial district.  Upon information and belief, each Defendant either resides in this Judicial District, has conducted and continues to conduct business in this judicial district and/or has engaged in continuous and systematic activities in this judicial district.

-15-

Interstate commerce for medical services is substantially affected by Defendants' conduct alleged herein.  Both Plaintiff and Defendants have patients from multiple states, including travelers and visitors from both within and outside of West Virginia and Ohio.

33.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c) and/or 15 U.S.C. § 22. The acts and omissions complained of herein occurred in Wetzel County, West Virginia, and therefore jurisdiction and venue are proper within this judicial district.

## IV.  RELEVANT MARKET AND WVU HEALTH'S MARKET POWER THEREIN

34.  The relevant market consists of interventional pain management care (also referred to herein as pain management care) provided to patients by physicians trained and specialized in pain blocking techniques that help patients manage and treat a variety of pain conditions with exercise, therapy, steroid injections, and/or minimally invasive procedures designed to intervene and disrupt the signals of pain.  These techniques differ from traditional forms of managing pain that generally involve the use of pain relievers ranging from over-the-counter drugs to prescription opioids. A goal of interventional pain management care is to minimize the use of opioids in treating pain while helping to increase patients' quality of life by enabling them to

engage in everyday activities more comfortably.  Patients who need and are seeking interventional pain management care do not view and cannot turn to traditional or other types of pain management as a substitute.

35.  Depending on the pain condition, an interventional pain management physician may utilize one or more therapeutic technique, including, without limitation, Steroid injections, implantable or intrathecal drug delivery systems (also known as "pain pumps"), and radiofrequency ablation (also known as RfA).

36.  Some pain management procedures - such as carpal tunnel surgery, pain pump implants, sacroiliac joint fusion, and spinal cord stimulator implants - involve surgical procedures that require the use of a hospital operating room and services. Accordingly, a pain management physician requires hospital privileges to use a hospital's facilities and services to perform such procedures.  Other procedures - such as RfA and some injections - may be performed in a doctor's office and do not require the use of a hospital facility.

37.  Not all interventional pain management specialists are qualified to perform all procedures, particularly those involving surgery, which require additional credentials, advanced surgical training, and experience.  Thus, qualifications differ substantially among pain management specialists, with some

-17-

providing more limited services than others.

38. Pain management physicians may either be independent contractors, such as Plaintiff, who contract with a hospital with suitable facilities to obtain privileges to perform certain procedures; or, they may be employed by a hospital or health system, such as the competing pain management specialists who are employed by WVU Health.  Some, but not all WVU Health-employed pain management specialists are qualified to perform pain management procedures requiring surgery or other procedures Plaintiff is qualified to perform. Plaintiff's credentials and capabilities made him a competitive threat to Defendants because a patient is more likely to seek out a pain management specialist with a broad range of credentials, capabilities, and expertise, regardless of the particular procedure the patient may need.

39. Because patients seeking pain management care have limited mobility, they typically cannot travel long distances to seek treatment.  For example, a patient with acute or chronic back, neck or leg pain typically can at most travel one or two hours to seek pain management care because traveling longer distances would result in great discomfort that could exacerbate the patient's condition.  Indeed, one or two hours of travel time is often difficult and painful for most patients seeking interventional pain management treatment.  As a result, unless there is no

suitable facility with qualified physicians within less than a two hour drive, patients generally remain within that distance when seeking interventional pain management care.

40.  Thus, the relevant geographic market is generally no greater than those portions of the surrounding counties in West Virginia and Ohio that are within a two hour drive (approximately 100 miles) of WCH in Wetzel County, West Virginia, where interventional pain management physicians can provide interventional pain management care, including surgical procedures (hereafter "Local Market").

41.  To the extent that patients are willing and able to travel farther for such care, Plaintiff alleges in the alternative that the relevant geographic market can be as broad as (1) the entire state of West Virginia, or (2) a region encompassing, in addition to the Local Market, the following counties in West Virginia and Ohio to the extent they are not already encompassed in the Local Market: Calhoun, Jackson, Pleasants, Ritchie, Roane, Wirt and Wood counties in West Virginia; and Washington County in Ohio (hereafter "Greater Mid-Ohio Valley Region").  See, e.g., https://www.movchamber.org/community/welcome-to-the-mid-ohio-valley/ (defining the counties in the Mid-Ohio Valley).

42.  On information and belief, there are currently approximately 14 interventional pain management specialists in all

-19-

of West Virginia, approximately 5 of whom (including Plaintiff) have advanced surgical training in interventional pain management. Further, Plaintiff is informed and believes, and on that basis alleges that, there are even fewer pain management specialists with advanced surgical training in interventional pain management in the Local Market and the Greater Mid-Ohio Valley Region. There is currently no similarly qualified specialist in Wetzel County, West Virginia, with advanced training in surgical pain-blocking procedures, and patients are now generally referred to the WVU Health facilities in Morgantown, West Virginia, approximately 1.5 hour drive from WCH, for most procedures Plaintiff previously performed at WCH. On information and belief, only 3 of the 5 specialists in West Virginia (including Plaintiff), who have advanced surgical training in pain management are independent providers, and none has privileges at a WVU Hospital.

43.   On information and belief, through various acquisitions, WVU Health has become the dominant health system in all of West Virginia with more than 70% market share for interventional pain management, and also controls more than 50% of the interventional pain management market in the Greater Mid-Ohio Valley Region. Through the exclusionary conduct alleged herein, WVU Health is seeking to achieve or maintain a monopoly position in these markets.

## V.  <u>FACTS RELEVANT TO ALL COUNTS</u>

**A.  Defendants' Pattern of Anticompetitive Conduct in the Relevant Markets**

44.  For approximately 12 years (between 2010 and August 5, 2022), Plaintiff and Defendant WCH had a mutually beneficial contractual relationship, pursuant to which WCH granted Plaintiff certain privileges, as an independent contractor, to provide certain pain management services at WCH.  In August 2013, Plaintiff also signed a lease agreement with WCH pursuant to which Plaintiff leased clinic space at WCH to see patients there.

45.  Plaintiff benefited from his contractual relationship with WCH by having access to WCH's facilities in New Martinsville, West Virginia to see patients and perform pain-blocking procedures requiring the use of hospital facilities.  WCH benefited from its association with Plaintiff by collecting certain technical fees for the procedures Plaintiff performed that utilized WCH's facilities and related services.  WCH also collected lease payments for Plaintiff's use of office space at WCH.

46.  WCH also benefited from this association because Plaintiff was credentialed to perform a wide range of pain-blocking procedures at WCH – including, carpal tunnel surgery, pain pump implants, sacroiliac joint fusion, and spinal cord stimulator implants, among others - which no other doctor at WCH was

-21-

credentialed to perform.  Plaintiff's qualification to perform such procedures at WCH added to WCH's name recognition in the area as a hospital facility with the capability and a qualified physician to provide such services.

47.  Indeed, until the anticompetitive and pretextual termination of his privileges at WCH, Plaintiff was the sole interventional pain management care specialist at WCH and Wetzel County with advanced surgical training in interventional pain management.

48.  On information and belief, when Plaintiff first obtained privileges at WCH as an independent contractor, WCH was an independent hospital from WVU Health.  According to a press release dated September 13, 2018, WCH became a "clinical affiliate" of WVU Health in 2016.  https://wvumedicine.org/news/article/wvu-hospitals-wetzel-county-hospital-enter-into-management-agreement/.  According to the same press release, WCH entered into a management agreement with WVU Health on or about October 1, 2018.  "Under the terms of the management agreement, … president and CEO of WVU Medicine Reynolds Memorial Hospital, … also be[came] CEO of Wetzel County Hospital."  *Id.*  Based on a press release dated July 7, 2020, WVU Health closed its acquisition of WCH on or about July 1, 2020.  https://wvumedicine.org/news/article/wetzel-county-hospital-becomes-full-member-ofwest-virginia-university-health-

system/.

49.  On information and belief, WVU Health generally has a policy of employing the physicians in its health system, which allows WVU Health not only to set the overall price of the procedures its employee-physicians perform by negotiating higher fee schedules for their services, but also to collect 100% of the price of every procedure.  Thus, while Plaintiff, as an independent contractor, had long been treating patients at WCH, which later became a WVU Health hospital, that is not WVU Health's preferred or typical relationship with the physicians in its health system.

50.  As an independent provider, Plaintiff is subject to a lower and largely non-negotiable fee schedule for his services.  Accordingly, after WVU Health acquired WCH, Plaintiff both practiced at a WVU Health hospital _and_ competed with WVU Health for patients and with respect to the price of professional services for interventional pain management care.  That competition at least to some extent constrained WVU Health's ability to raise the price of professional services (and thus the overall cost of a pain management procedure) to supra-competitive levels.

51.  On November 5, 2018, shortly after signing the management agreement with WCH, Plaintiff received a letter on WVU Health letterhead that Plaintiff's lease agreement would be terminated effective December 15, 2018, claiming the termination

-23-

was supposedly due to space limitations.  As a result, Plaintiff lost his ability to see patients at WCH.

52.  After WVU Health closed on its acquisition of WCH, Dr. Vaglienti, who had been in charge of recruiting pain management specialists for all of the hospitals within the WVU Health System, also took charge of such recruiting for WCH.  Dr. Vaglienti, and WVU Health in general, made it clear that they were dissatisfied with having to compete with Plaintiff for patients using Plaintiff's services at WCH, who otherwise would have to travel to a WVU Health facility that employed a similarly qualified specialist.

53.  In particular, because of the broad scope of his qualifications, Plaintiff could offer patients a "one-stop-shop" – encompassing a multitude of pain management treatments including surgical procedures – at a convenient location closer to the patients.  However, Dr. Vaglienti and WVU Health wished, and indeed took anticompetitive actions, to ensure that patients in the relevant markets (including the Local Market), who otherwise would use Plaintiff's services more conveniently at WCH, would be forced to travel to WVU Health's facilities in Morgantown, West Virginia – 1.5 hour's drive from WCH – to seek most treatments, including surgical procedures, from a WVU Health employed physician.

54.   In furtherance of its exclusionary plan, Defendants initially took actions to limit the types of procedures Plaintiff was allowed to perform at WCH, without regard to Plaintiff's qualifications or experience.  Because of its dominant market position and its control of the hospitals in its health system, WVU Health exerts significant control over whether, and under what conditions, independent physicians like Plaintiff may obtain privileges to perform specific interventional pain management procedures at its facilities.

55.   As new procedures are perfected, and physicians like Plaintiff obtain training and certification to perform them, it becomes necessary from time to time for physicians to update their privileges at a hospital so they can offer patients those new forms of treatment.  Without obtaining additional privileges from a hospital or health system, a pain management physicians like Plaintiff cannot perform such new procedures at that hospital facility.

56.   On several occasions after WVU Health acquired WCH, Plaintiff submitted requests to the Credentials Committee for seven additional privileges to perform Reactive8; Stabilink; RfA; StimWave; placement of Paddle leads for Spinal Cord Stimulation; Peripheral nerve decompression; and intracept procedure to help de-innervate pain coming from the lumbar

vertebrae.  Plaintiff also submitted information, including relevant certifications, supporting his qualification to perform such procedures.  After Defendants failed to respond to Plaintiff's initial requests, Plaintiff reiterated his requests in a subsequent letter of March 3, 2022, again forwarding supporting materials.  Plaintiff requested these additional privileges in order to offer more treatment options to patients who lived or were otherwise closer to WCH, so that those patients would not have to travel longer distances to their physical detriment to seek those treatments, or forgo those treatments altogether due to their inability to travel such distances.

57.  In a May 5, 2022 letter from Defendant Blum, WVU Health and WCH outright denied Plaintiff's requests as to six of the seven procedures.  The letter provided no substantive explanation or evidence to support the stated denials.  It merely referred to unidentified "Findings and opinions from an external peer review" without identifying the supposed external "peers" who reviewed Plaintiff's requests and concluded Plaintiff should be denied the requested privileges, how those individuals were "peers" of Plaintiff or otherwise qualified to assess Plaintiff's requests, or on what bases they reached their supposed findings and opinions.  Nor did the letter indicate

Plaintiff was unqualified, or provide any rebuttal to
Plaintiff's stated bases for his qualifications to perform those
procedures.

58.   The sole pretextual reason provided for denying
Plaintiff's request for privileges as to at least Reactive8,
RfA, and StimWave procedures was the "cost prohibitive nature of
[each] procedure."  The pretext was evident.  For example,
Plaintiff was informed by the third-party entity that approves
WVU Health's use of outside devices that it had already approved
WVU Health's use of Stimwave implants.  Thus, WVU Health's
employed neurosurgeon physicians in Morgantown could perform the
procedure based on that approval.  Plaintiff is unaware of any
cost differences between performing StimWave implant procedures
at WCH as opposed to the WVU Health facilities in Morgantown.
Nor did Defendants provide any explanation as to how the
StimWave implant procedure would be more "cost prohibitive" if
performed at WCH, and given that WVU Health had received
approval for using the device.  In a response letter of June 1,
2022, Plaintiff raised this issue, and provided further
explanations to address Defendants' denial of other requested
privileges.

59.  For example, Plaintiff also noted that WCH
already had purchased the supposedly "cost prohibitive" RfA

equipment.  Indeed, Dr. Mrad, a competing pain management physician WVU Health employs, would drive to WCH from Parkersburg, West Virginia (approximately 1 hour drive from WCH) to treat patients with that equipment **at WCH**. Plaintiff expressly asked whether "**this [RfA] device [at WCH] is only to be used by salaried WVU pain physicians?**" Not surprisingly, Plaintiff never received any further response from Defendants to this or other points he raised in his June 1, 2022 letter.  To be clear, Plaintiff has performed hundreds of RfA procedures in his office and requested the additional privilege at WCH for the convenience of patients who were unable to travel to Plaintiff's office in McMechen, West Virginia.  Indeed, by performing the RfA procedures at WCH, Plaintiff would forgo the technical service fees associated with performing that procedure in his office, and thus would receive **less** compensation for performing the RfA procedure at WCH for the convenience of his patients.

60.  Defendants' actions  - including their failure to respond to Plaintiff's June 1, 2022 letter - demonstrate that the real reason for refusing Plaintiff's requests was to eliminate competition between independent physicians like Plaintiff and the pain management physicians WVU Health employs either directly or through a wholly-owned subsidiary.  Indeed, it was not long after Plaintiff's June 1, 2022 letter that

-28-

Defendants summarily suspended Plaintiff's privileges at WCH based on fictitious claims that Plaintiff abused a patient during a pain pump trial procedure – claims that the WVBOM later soundly rejected as lacking probable cause.

61.  Defendants' pretextual denial of the additional privileges thus served no procompetitive purpose, especially where Defendants failed to provide any substantive reason beyond a bare reference to an unidentified "external peer review," or in any way refute his qualifications.  However, it did advance an anticompetitive goal – excluding Plaintiff and restricting patient choice by artificially and pretextually limiting the types of procedures Plaintiff could perform at WCH so that WVU Health could secure and/or maintain a monopoly in pain management care by forcing patients to go to its Morgantown facility for treatment by WVU Health employed specialists. Given Plaintiff's qualifications and experience, patients would have benefited by having broader options among pain management specialists, including a nearby specialist capable of offering broad services no other physician at WCH provided.

62.  Once WVU Health had implemented its pretextual restriction on Plaintiff's privileges in order to shield its own employees (and ultimately itself) from competition, it then proceeded to move one of its employed physicians to WCH where

the employed physician could leverage the unfair competitive advantage WVU Health had put into place in order to secure or maintain a monopoly.  In early 2022, WVU Health moved Dr. Mrad - a pain management specialist, already in WVU Health's employment in Parkersburg, West Virginia - to WCH.

63.  Dr. Mrad received his basic credential in pain management from WCH on or about February 28, 2022.  Dr. Mrad performs some, but not all, of the interventional pain management procedures that Plaintiff can provide.  Specifically, Dr. Mrad is qualified to perform injections and RfA procedures, but lacks the necessary training, credentials and experience to perform the surgical pain-blocking procedures Plaintiff is qualified to perform and did perform at WCH.  Despite the substantial disparity in Plaintiff's and Dr. Mrad's qualifications, WVU Health and WCH began to heavily promote Dr. Mrad with billboards at both ends of New Martinsville, West Virginia, touting that "YOUR PAIN IS UNDER **NEW** MANAGEMENT" - thus deceptively implying to unwitting patients that (i) Dr. Mrad was at a minimum as qualified and experienced as Plaintiff, and (ii) Plaintiff had been replaced or was not capable of offering pain management services at WCH.  Defendants engaged in all of this conduct in order to eliminate Plaintiff as a competitor.  At the time, Plaintiff and Dr. Mrad competed with

respect to at least the pain management procedures Dr. Mrad was in fact qualified to perform.

64.  Neither WVU Health nor WCH ever promoted Plaintiff's services, despite his broader qualifications and credentials.  Defendants should have allowed Plaintiff and Dr. Mrad to compete fairly on the merits of their respective qualifications without putting their thumb on the scale by making deceptive and incomplete representations to potential patients that at least implied Plaintiff was somehow unable to "manage" their pain.

65.  In keeping with this exclusionary pattern of conduct, and even though Plaintiff had been the only interventional pain management physician at WCH for over a decade, WVU Health denied Plaintiff's request to post Plaintiff's biographical information and picture on its website. In contrast, WVU Health has devoted an entire webpage to promoting Dr. Mrad, who is not qualified to perform most of the procedures Plaintiff is qualified to perform.  The only information about Plaintiff that WVU Health would agree to make available on its website was Plaintiff's name and his basic specialty (*i.e.*, pain management), without further elaboration of his experience, education, credentials and other relevant qualifications.

66.   This disparate treatment of Plaintiff because he was an independent physician, and despite his long association with WCH, has harmed more than just Plaintiff; it broadly has harmed competition and consumers of interventional pain management care.  In particular, WVU Health withheld and restricted the flow of relevant information that is vital to potential patients' ability to make informed decisions about a suitable provider when they search WVU Health's website for a qualified physician.

67.   Thus, by providing one-side information only about those specialists WVU Health employed – as opposed to <u>all</u> doctors with privileges at its hospitals – WVU Health hindered the patients' ability to compare – for example – Plaintiff's qualifications with those of Dr. Mrad or another physician employed by WVU Health to determine which physician best suited their needs.

68.   These further actions also lacked any redeeming procompetitive justification and only furthered an anticompetitive purpose – to restrain consumer choice by limiting information regarding patients' options so that WVU Health could monopolize the relevant market by controlling professional services.  Thus, by taking all these actions in combination against Plaintiff, WVU Health cumulatively ensured

that Plaintiff's pain management practice would be restricted so that WVU Health could divert more of the patients in the relevant markets to its own facilities where it employed the physicians and controlled the price of their professional services.

69.  Unsatisfied with just restricting Plaintiff's practice and privileges, WVU Health through its control over other Defendants, embraced a more sinister plan to completely eliminate competition from Plaintiff by stripping him of <u>all</u> hospital privileges.  Not long after denying his request for additional privileges, Defendants proceeded with an entirely fictional claim of patient abuse described in Section I, which as the WVBOM concluded had **"NO PROBABLE CAUSE."**

70.  Thus, in keeping with the pattern of anticompetitive conduct alleged herein, Defendants further acted unreasonably, anticompetitively, pretextually and willfully by (1) summarily suspending Plaintiff's privileges <u>without</u> first holding a proper peer review, as further alleged herein; (2) holding a sham "hearing" that lacked any indicia of due process, only <u>after</u> summarily suspending plaintiff's privileges, as further described in Section V.B, below; (3) ignoring sworn testimony by the patient (the alleged victim), who utterly refuted claims that any abuse took place; (4) proceeding to

confirm their unjustified summary suspension of Plaintiff's privileges without cause; (5) maliciously reporting their unwarranted summary suspension of Plaintiff to the WVBOM and the NPDB; (6) thereafter permanently terminating Plaintiff's privileges without any probable cause; and (5) refusing to remove their baseless summary suspension report from the NPDB, even after the WVBOM's ruling vindicated Plaintiff.

71.    Even after these events, and in additional demonstration of its anticompetitive animus, WVU Health proceeded to further restrict Plaintiff's ability to treat his patients.  In December 2022, WVU Health abruptly cut off Plaintiff's access to EPIC, which is the electronic medical record system that WVU Health uses to catalog all patients that enter its hospitals and clinics.  That system provides the only method for physicians to record and access information regarding a patient's medical history – including a patient's health history, physical exam results, laboratory and imaging results, and any operations, among others.

72.    All WVU Health hospitals are on the EPIC system. Thus, hospitals and providers no longer fax information, such as a patient's lab results, to physicians.  Instead, it is expected that all relevant patient records would be logged into and maintained in EPIC so that various providers can utilize EPIC to

obtain and review needed information regarding their patients.
Physicians also record the results of their patient visits and
procedures in that system so other physicians using the system
can also access that information when necessary to their
treatment of the same patient.

73.   Plaintiff received affiliate status access to
Epic on or about January 2019 before WVU Health acquired WCH.
Pursuant to that status, he and his staff could use WVUchart to
access and update his patient's medical records as necessary.
After WVU Health's acquisition of WCH in July 2020, WCH was
added to the EPIC system as a WVU Health hospital, and not just
an "affiliate."  Because Plaintiff had hospital privileges at
WCH, Plaintiff thereafter received necessary training and became
a Credential/Privileged Provider physician within the EPIC
system.  Plaintiff thus used the EPIC User Web to perform needed
tasks, consult other providers and access his patient
information.  Access to the Epic system is critical to
Plaintiff's patient care as it is the sole means of
communication used by the WVU providers and hospitals.

74.   In the absence of other "independent" hospitals
or providers, Plaintiff has had no option but to send his
patients to WVU Health facilities for lab testing and any
necessary radiology imaging.  He also uses the EPIC system to

make referrals to WVU Health specialists as needed, given the general dearth of independent physicians like Plaintiff in the relevant market.  The EPIC system is essentially the only way to obtain information including critical test results for patients in the WVU Health system. Not having access would be catastrophic.  Thus, without access to EPIC, Plaintiff would be essentially "handcuffed" in offering care to his patients, and would lose his ability to timely treat them.

75.  Cutting off Plaintiff's access to EPIC also would harm patients to the extent their treatment would be delayed due to Plaintiff's inability to timely receive important medical results from the hospital or other providers in the WVU Health system.  In other words, Plaintiff and his staff would have to contact the hospital or other WVU Health providers to have them "fax" information and results to Plaintiff's office, and there is always a risk that Plaintiff may not receive all relevant data necessary to treat his patients.

76.  WVU Health is fully aware of these repercussions, especially for patients.    Nonetheless, on or about December 23, 2022 - shortly after Plaintiff filed the original complaint in this action - WVU Health retaliated against Plaintiff by closing his account **with no prior notice**.  Plaintiff discovered

this action when he was unable to "log in" to his EPIC account during that Christmas week.

77.  After multiple attempts to contact the EPIC "hotline" and the relevant Help Desk personnel over a ten-day period, Plaintiff was finally told the termination of his access was supposedly "inadvertent" and that his access would be restored as an "affiliate."  Thus, for at least 10 days Plaintiff could not access any patient records to treat his patients – ultimately to the detriment of those patients.

78.  In a January 9, 2023 letter, WVU Health indicated that Plaintiff's privileges to use EPIC system had been terminated after underlying "concerns surfaced regarding the nature of his access to certain protected health information." Once again, the absence of any supporting explanation as to what those "concerns" may have been when Plaintiff only used EPIC for treating his patients demonstrates the pretextual, exclusionary and malicious nature of WVU Health's conduct.

79.  The willful and exclusionary suspension of Plaintiff's access to EPIC lacked any redeeming procompetitive justifications and served only to further hinder Plaintiff's ability to treat patients in competition with WVU Health. Indeed, the only goal of WVU Health's entire course of conduct has been to reduce or eliminate competition from independent

-37-

contractors like Plaintiff – irrespective of the detrimental effects on patients – whose welfare should have been WVU Health's primary goal.

80.  When a health system like WVU Health, excludes competition from independent contractors like Plaintiff, it gains a greater degree of freedom to raise the professional services fee and thus the overall cost of a pain management care procedure.  In such circumstances, the only constraint on such health system's ability to raise prices to supra-competitive levels is the degree of competition from non-affiliated or "independent" hospitals or health systems in the same geographic market that also offer the same services.  The less significant the degree of such competition, or the higher the health system's share of the relevant market, the greater control it can exert over the prices of professional services, and the more freedom it enjoys in raising overall prices by excluding independent physicians like Plaintiff.

81.  Because of its dominant market position, WVU Health faces very little competitive pressure from other health systems and hospitals with respect to interventional pain management care.  For example, there is no alternative to WVU Health in Wetzel County.  The nearest non-WVU Health hospital in Tyler County, West Virginia lacks on-site resources (e.g.,

-38-

necessary equipment, etc.) to accommodate patients needing interventional pain management care in-house; its closest affiliate is approximately 61 miles or one hour drive from Wetzel County in Marietta, Ohio, where two specialists offer at least some of the services Plaintiff provided.  The only other competing non-WVU Health facility with at least some similar pain management services is in Charleston, West Virginia, which is approximately 128 miles or more than 2 hours from Wetzel County and is thus even more difficult to reach than WVU Health's Morgantown, West Virginia facility by most patients needing pain management care.

82.    Accordingly, these hospitals do not impose sufficient competitive pressure on WVU Health to constrain its pricing or control of the relevant markets alleged herein, absent competition from independent providers like Plaintiff. Thus, by eliminating Plaintiff, WVU Health is seeking to achieve or maintain a monopoly and to control and raise the prices of professional services without improving quality, to the detriment of patients.

**B.    Defendants' Sham "Peer Review"**

83.    As an independent contractor at WCH, Dr. Chalifoux was subject to certain bylaws, policies and procedures at Defendant WCH.

-39-

84.  Defendants were also bound by those same bylaws, policies and procedures.

85.  Accordingly, those bylaws, policies and procedures created certain due process rights to which Dr. Chalifoux was entitled.

86.  On or about June 16, 2022, Defendant WCH wrongfully summarily suspended Dr. Chalifoux' privileges based on unjustified claims of patient abuse as described herein.

87.  Section 4.2 of Defendant WCH's Credentials Manual provides that the President may suspend privileges "...whenever action must be taken **immediately in the best interest of patient care of safety."** (emphasis added).

88.  The sole supposed incident that provided the basis for Defendant WCH's summary suspension of Dr. Chalifoux' privileges occurred on June 6, 2022 as referenced in Defendant Smith's summary suspension letter to Plaintiff dated June 16, 2022 and Defendant Smith's Notice of Summary Suspension Hearing dated June 27, 2022.

89.  Defendant Sean Smith, President of Defendant WCH who authored the summary suspension letter testified under oath that he was aware of the incident on the same day that it happened but did not summarily suspend Dr. Chalifoux' privileges until June 16, 2022, ten days later.

90.   Defendant Smith appointed Defendant Huffman to investigate the allegations against Dr. Chalifoux.

91.   Defendant Huffman interviewed Defendant WCH's obviously biased employee witnesses but never interviewed Dr. Chalifoux or the patient.

92.   Further, Defendant Smith testified that he permitted Dr. Chalifoux to perform three more procedures after he was aware of the incident of June 6, 2022 and before the summary suspension of June 16, 2022, which demonstrates that Defendants were never concerned that Plaintiff posed an immediate threat to patient safety, Otherwise, they would not have permitted him to perform those additional procedures.

93.   Further, Defendant Smith testified that, since he is not a health care professional, he consulted with health care professionals prior to making the decision to summarily suspend Dr. Chalifoux' privileges, but he consulted with members of the Medical Executive Committee ("MEC"), including, but not limited to Defendant Dr. Donald Blum, Defendant Dr. Mathew Sokos, and Defendant Dr. Niraj Mohan, all of whom were the same members of the MEC who conducted a hearing on July 1, 2022 (with the exception of Dr. Mohan who was apparently out of town and was replaced for the MEC hearing by Defendant Dr. Hany Tadros) pursuant to Defendant WCH's bylaws and Credentials Manual to

-41-

consider terminating the summary suspension on which they were consulted.

94.    Defendant Smith's consultation with these doctors and the failure of Defendants WCH and WVU Health to disclose this clear conflict of interest amounted to a "Sham Peer Review."

95.    In fact, despite inquiry, Defendants WCH and WVU Health specifically represented by email on June 24, 2022 that "...none of the Executive Committee members were directly involved in bringing forth any of the concerns involving Dr. Chalifoux which resulted in the summary suspension."  This statement is obviously not true as learned at the hearing through Defendant Smith's testimony.

96.    Section 5.2 of the Credentials Manual affords Dr. Chalifoux the opportunity for a hearing to consider his summary suspension before an ad hoc committee of the medical staff.

97.    Section 5.4 of the Credentials Manual specifies that "No staff member who has actively participated in the consideration of a prior recommendation will be appointed as a member of this ad hoc committee..."

98.    Defendant WVU Health provided counsel and advice to Defendants WCH, Blum, Sokos, Mohan, Tadros, Smith and Huffman

who all conspired to deprive Dr. Chalifoux of his due process rights contained in Defendant WCH's bylaws.

99. Prior to the MEC hearing on July 1, 2022, Defendants WCH and WVU Health failed to provide Dr. Chalifoux with a copy of the complaint against him and a copy of any witness statements despite a specific request via email from Plaintiff's counsel to counsel for Defendants WCH and WVU Health and in violation of Section 5.6 of Defendant WCH's Credentials Manual.

100. The first time Plaintiff learned the identity of the witnesses who would testify at his hearing was a mere 2 days before his hearing in correspondence from WVU Health on June 28 & 29, 2022. Thus, Plaintiff had no information as to what those witnesses had said or would testify to at the hearing, which amounted to an ambush. On June 28, 2022, Defendant WVU Health in its capacity as counsel for Defendant WCH, provided notice to Plaintiff's counsel that it would call three witnesses at the MEC hearing on July 1, 2022 and that it would provide documents it may submit to the MEC by June 29, 2022. No witness statements or notes from Defendant Huffman's interviews of said witnesses were provided nor was a copy of the Complaint provided to Plaintiff. Further, Defendant WVU Health refused to provide a court reporter for the MEC hearing and forced Plaintiff to

provide one at his own expense.  On June 29, 2022, Defendant WVU Health disclosed an additional witness but no witness statements or copy of the complaint, but rather provided patient records, the suspension letter of June 16, 2022 and the Notice of Hearing of June 27, 2022 as exhibits it intended to introduce at the MEC hearing.

101.  The composition of the ad hoc committee comprised of the same members who participated in the recommendation of summary suspension was a clear violation of Defendant WCH's by laws and Credentials Manual.

102.  As one would expect, the MEC upheld Defendant Smith's summary suspension of Plaintiff.

103.  Plaintiff exercised his right under the bylaws to appeal the MEC's decision to uphold the summary suspension to Defendant WCH's Board of Directors ("Board").

104.  Defendant WCH's Board consists of unknown and undisclosed members.

105.  Plaintiff Chalifoux presented a Position Statement to the Board in support of his appeal but was wrongfully prohibited by Defendants WCH and WVU Health from making any oral presentation or even appearing before the Board.

106.  As one would expect, the Board rubber-stamped the summary suspension of Plaintiff.

107.  Defendants WCH and WVU Health reported the summary suspension to the NPDB and the WVBOM.

108.  The report to NPDB pertaining to the wrongful summary suspension of Plaintiff Chalifoux is available to licensing bodies, credentialing bodies, health care facilities, professional malpractice insurers and others.

109.  WVBOM had opened an investigation into Dr. Chalifoux and the wrongful summary suspension but on February 6, 2023, WVBOM dismissed the Complaint against Dr. Chalifoux finding **NO PROBABLE CAUSE.**  (emphasis added).

110.  Specifically, the Order of Dismissal entered by WVBOM found as facts that matter concerned Dr. Chalifoux' treatment of a patient during a pain pump trial being the same procedure for which Defendant WCH summarily suspended him.

111.  Specifically, in its investigation, WVBOM reviewed the same patient records from the pain pump trial that Defendants WCH, Blum, Mohan, Tadros, Sokos and Smith reviewed.

112.  Specifically, WVBOM reviewed an affidavit from a neurologist who opined that Dr. Chalifoux performed the procedure within the standard of care.

113.  Accordingly, it is clear that WVBOM found no probable cause and dismissed the Complaint against Dr. Chalifoux that arose out of the exact same procedure for which Defendants

WCH and Smith summarily suspended Dr. Chalifoux' privileges and for which Defendants Blum, Mohan, Tadros and Sokos participated.

114.   WVBOM's Order of Dismissal is clear and convincing evidence that Defendants' WCH and Smith's summary suspension were without any cause and wrongful and that Defendants Blum, Mohan, Tadros and Sokos' participation therein was "sham peer review."

115.   Indeed, neither Defendant Blum, Mohan, Tadros or Sokos has any experience conducting pain pump trials and therefore no knowledge of the standard of care and therefore no qualifications to participate in any peer review of the subject procedure.

116.   During this same period of time, Defendants WCH and WVU Health were recruiting and hired Dr. Luay Mrad who specializes in pain management just as Dr. Chalifoux does.

117.   Defendants WCH and WVU Health promoted Dr. Mrad with billboards at both ends of town touting that "YOUR PAIN IS UNDER NEW MANAGEMENT."

118.   Defendants WCH and WVU Health intentionally and in violation of the law drove Dr. Chalifoux out of the market area in an attempt to limit and control competition and monopolize the market share to their benefit.

-46-

119.  All Defendants engaged in a civil conspiracy to carry out a "Sham Peer Review" with the intent to cause financial harm to Dr. Chalifoux.

120.  Dr. Chalifoux' reputation has been damaged by the acts of all Defendants.

121.  Dr. Chalifoux has suffered damages and financial harm as a result of the conduct of all Defendants.

### Count I

**Restraint of Trade in Violation of Section 2 of the Sherman Act (Monopolization and/or Attempted Monopolization )**

122. Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

123. Plaintiff is informed and believes, and on that basis alleges, that the relevant markets, as defined in Section IV above, are valid antitrust markets.

124. On information and belief, WVU Health is already the dominant health system in West Virginia with more than a 70% market share, including for pain management care, and also controls more than 50% of the market in the Greater Mid-Ohio Valley Region as defined herein.  In addition, WVU Health and its employed physicians control 70% or more of the Local Market.

125. WVU Health, through its control of WCH and other Defendants, has willfully engaged, and is illegally engaging, in a cumulative and ongoing course of conduct, as alleged in Sections I and V above, to monopolize or at a minimum attempt to monopolize the market for interventional pain management services so as not only to maintain or expand its more than 50% market share in the Greater Mid-Ohio valley Region, but also to obtain or maintain more than 70% share of the relevant West Virginia market and Local Market as well.

126. As more fully alleged in Sections I and V.A, such exclusionary conduct includes, <u>without limitation</u>, (a) pretextually restricting hospital privileges for independent contractors like Plaintiff to limit competition with its employed physicians after acquiring WCH; (b) posting relevant biographical information on its websites for its employed physicians, but refusing to provide similar biographical information regarding Plaintiff's qualifications, experience and credentials even though Plaintiff had privileges to practice at a WVU Health hospital; and (c) summarily suspending and then terminating Plaintiff's hospital privileges based on unjustified allegations of patient abuse and without a proper peer review; (d) reporting that unjustified summary suspension to the WVBOM and the NPDB, and thereafter refusing to remove that unjustified

NPDB report even after the WVBOM concluded that the complaint against Plaintiff had **"NO PROBABLE CAUSE."**

127. According to Defendants, because WCH is a wholly owned subsidiary of WVU Health, WCH "shares WVU[ Health's] purpose." Doc. 16-1 at 19. In particular, WVU Health and WCH "share[d] a unity of purpose when Plaintiff was summarily suspended and the suspension was upheld." *Id.* Thus, any actions of WCH in wrongfully accusing Plaintiff and then terminating Plaintiff's privileges without probable cause were in furtherance of WVU Health's purpose to monopolize the relevant markets and pursuant to WVU Health's "control over WCH." *See id.* Similarly, because other Defendants were also acting as agents of WCH and/or WVU Health, when they conducted the sham "hearing" and confirmed Plaintiff's summary suspension without probable cause, they also shared the same unity of purpose to further WVU Health's monopolization of the relevant market for interventional pain management care.

128. Defendants' exclusionary conduct not only has harmed and continues to harm Plaintiff, but also has harmed and continues to harm competition in the relevant market by, *inter alia*, (a) eliminating or at a minimum reducing competition from independent contractors like Plaintiff, (b) restricting consumer choice; and (c) eliminating or at a minimum reducing patients'

access to lower-cost professional services for pain management care provided by independent specialists and forcing consumers to accept higher cost and/or lower quality substitutes employed by Defendants.

129. The patients needing pain management care in the relevant markets are the ultimate victims of such willful and exclusionary conduct because Plaintiff's elimination from the relevant market has reduced the number of already-few physicians there who are qualified to provide the wide-ranging services Plaintiff previously provided at WCH.  Those patients now have to travel farther distances – to their physical and financial detriment, as well as Plaintiff's detriment, for most of the procedures Plaintiff previously performed at WCH, and the additional services Plaintiff could have provided there but for WVU Health's arbitrary actions to cause Plaintiff's privileges to be limited. Patients are obtaining those services mostly from other WVU Health providers now by having to travel longer distances to obtain them.

130. Defendants undertook the willful course of conduct alleged herein with the specific intent to further WVU Health's purpose of monopolizing the relevant market for interventional pain management care by controlling the professional services rendered in connection with such care.  At

a minimum, there is a dangerous probability that, unless restrained, the course of conduct alleged herein will succeed - in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 - by shielding WVU Health from competition from competitors like Plaintiff, and ultimately giving WVU Health control over professional services for pain management care to the detriment of consumers.

131. By reason of the violations of Section 2 of the Sherman Act alleged herein, Plaintiff has been injured in his business or property, including through, inter alia, (a) the loss of past, present and future income and profits as a result of his loss of patients and potential patients; (b) the loss of goodwill and reputation as a result of Defendants' wrongful accusations of patient abuse that is still reflected in their unjustified report to the NPDB; and (c) the prospective destruction of his practice.

132. Plaintiff has also suffered and will continue to suffer irreparable injury by reason of WCH's and WVU Health's refusal to remove the baseless summary suspension of Plaintiff from the NPDB even after the WVBOM concluded Plaintiff did nothing wrong.  That report can only be removed by WVU Health/WCH or by an order of this Court.  Given their refusal to act, an injunction by this Court requiring the removal of that

baseless report from the NPDB is Plaintiff's only option. Plaintiff has been and continues to be harmed in his ability to obtain an alternative affiliation or hospital position by this baseless report.  This also harms competition because Defendants have weakened Plaintiff's ability to find any alternative affiliations or position with a WVU Health competitor.

133. For these harms, Plaintiff seeks remedies pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, including, without limitation, an injunction as specified herein, treble damages, reasonable attorneys' fees, prejudgment interest, and any and all other remedies the Court may deem just and proper.

## Count II

### (Sham Peer Review/Violation of Due Process)

134.  Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

135.  Medical staff bylaws require due process under West Virginia law per *Mahmoodian v. United Hosp. Ctr., Inc.,* 404 S.E.2d 750 (W.Va. 1991).

136.  Plaintiff Chalifoux was on the medical staff at Defendant WCH at all relevant times and was a party to the Bylaws of Defendants WCH and WVU Health.

137.  Plaintiff Chalifoux fully performed all of his obligations under the Bylaws.

138.  Plaintiff Chalifoux did not breach the Bylaws in any material way.

139.  Defendants materially breached their due process obligations under the Bylaws by summarily suspending Plaintiff Chalifoux without satisfying the Bylaws' requirement that a summary suspension be imposed only "...whenever action must be taken **immediately in the best interest of patient care or safety**..." (emphasis added)(Bylaws – Credentials Manual Section 4.2.1).

140.  Defendants' summary suspension denies Plaintiff Chalifoux his rights under the Bylaws to care for patients.

141.  Defendants' violated the Bylaws by allowing Plaintiff Chalifoux to perform three additional procedures on patients at Defendant WCH between June 6, 2022, the date of the incident which was the subject matter of the summary suspension, and June 16, 2022, the date of the summary suspension; thus indicating there were no grounds for the summary suspension as the ten day delay evidences an absence of the requirement in the Bylaws that "...action must be taken immediately in the best interest of patient care or safety..."

142.  Prior to the summary suspension on June 16,

2022, Plaintiff Chalifoux had no notice of allegations of conduct impacting patient care or safety concerning his practice.

143.    Defendants materially breached the Bylaws in the following ways:

A)    Summarily suspending Plaintiff Chalifoux over a matter that did not immediately impact patient care or safety and permitting Plaintiff Chalifoux to conduct three more procedures at Defendant WCH after the incident forming the basis for the summary suspension on June 6, 2022 and the summary suspension on June 16, 2022;

B)    Defendant Huffman failing to adequately investigate the allegations against Plaintiff Chalifoux by failing to interview him and the patient involved in the procedure on June 6, 2022 and failing to take other reasonable steps to investigate the allegations against Plaintiff Chalifoux, failing to make a reasonably objective investigation of the allegations against Plaintiff Chalifoux and otherwise acted in bad faith such that Defendants are not entitled to the immunity afforded by HCQIA;

C)    Defendant Smith consulting with Defendants Blum, Tadros, Mohan and Sokos prior to summarily suspending Plaintiff Chalifoux then Defendants Blum, Tadros and Sokos comprising the

MEC which conducted a hearing concerning Plaintiff Chalifoux'
summary suspension on July 1, 2022 without prior disclosure by
Defendants WCH and WVU Health that those Defendants conducting
the hearing had consulted with Defendant Smith regarding the
summary suspension in violation of Section 5.4 of the
Credentials Manual;

D)   Defendants WCH and WVU Health failing to provide
proper pre-hearing disclosures of the complaint against
Plaintiff Chalifoux as well as witness statements prior to the
July 1, 2022 hearing in violation of Section 5.6 of the WCH
Credentials Manual;

E)   Defendants WCH and WVU Health failing to present
any competent expert opinion or testimony from a qualified
expert in the field of pain management and neurosurgery
concerning the patient care and safety concerns during the June
6, 2022 procedure by Plaintiff Chalifoux;

F)   Defendants WCH and WVU Health introduction of
irrelevant and prejudicial evidence at the hearing before the
MEC on July 1, 2022 that went beyond the scope of the notice of
hearing;

G)   Defendant WCH and WVU Health failing to permit
Plaintiff Chalifoux to make oral presentation to the Board on
August 3, 2022 of his appeal of the MEC's decision following the

-55-

hearing on July 1, 2022; and

H)    Such other ways as may come to light through discovery.

144.    Defendants WCH and WVU Health ultimately imposed a penalty on Plaintiff Chalifoux based on its Sham Peer Review and violation of his due process rights that was far harsher than what was appropriate and justified in violation of the Bylaws and their implied covenant of good faith and fair dealing under the Bylaws.

145.    Defendants took professional review action without a reasonable belief that the action was for the furtherance of quality health care.

146.    Rather, it appears that Defendants allowed Dr. Chalifoux to continue practicing for ten days after the alleged incident that resulted in the investigation and to perform three carpal tunnel surgeries because Defendant WCH had no other physician with privileges able to perform those procedures.

147.    Based upon Defendants failure to interview Dr. Chalifoux and the patient or to have the incident reviewed by a qualified expert in the field of pain management, it is obvious that Defendants failed to make a reasonable effort to obtain the facts of the matter before conducting and concluding Defendants' professional review action.

148.  Defendants' so-called professional review action was not taken with a reasonable belief that the action was warranted by the facts known after such reasonable efforts to obtain the facts, as there was none, and after meeting the "Notice and Hearing" requirements as the notice was inadequate and the hearing was before a tainted MEC, and therefore, Defendants are not entitled to the immunity otherwise afforded by HCQIA.

149.  Defendants WCH and WVU Health further caused harm and damage to Plaintiff Chalifoux by ultimately converting the summary suspension to a termination of his privileges at Defendant WCH and by reporting said termination to NPDB and WVBOM.

150.  Defendants WCH and WVU Health's summary suspension of Plaintiff Chalifoux was in violation of the express federal minimum standard for summary suspensions, as set forth in the Health Care Quality Improvement Act ("HCQIA"). This summary suspension was not based on legitimate peer review, and in fact constituted a Sham Peer Review.  Defendants WCH and WVU Health's actions did not comply with the immunity provisions of HCQIA as the sham peer review conducted in this instance was done in bad faith by all Defendants.

151.  As a direct and proximate result of the "Sham Peer Review" and absence of due process, Dr. Chalifoux has and will suffer damages in the form of lost wages and earnings, loss of reputation, loss of earning capacity, increased medical malpractice premiums and other consequential damages as shall come to be learned through discovery.

### Count III
### (Defamation)

152. Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

153.  Defendants asserted false and defamatory statements about Plaintiff Chalifoux, asserting that he had committed a very serious breach of his professional responsibilities that would justify the draconian action of a summary suspension.

154.  Defendants published these statements in an unprivileged manner to third parties, including without limitation Defendants' informing administrators and physicians who were not on the Medical Executive Committee as well as NPDB and WVBOM.

155.  Defendants' publication of these statements was in bad faith and not privileged.

156.   Defendants WCH and WVU Health's publication of defamatory statement were in the form of a report of the summary suspension and subsequent termination to NPDB that was based on a Sham Peer Review and a Complaint to WVBOM that was also based on a Sham Peer Review which were not privileged by HCQIA.

157.   Defendants WCH and WVU Health's statements defamed Plaintiff Chalifoux by falsely representing and implying that he had a quality-of-care deficiency so severe that it justified the draconian sanction of a summary suspension without notifying NPDB or WVBOM that the summary suspension was based on Sham Peer Review and violation of Plaintiff Chalifoux' due process rights.

158.   The defamatory statements about Plaintiff Chalifoux resulting in the revocation of his privileges at Defendant WCH caused his colleagues (upon whom Chalifoux relies for referrals) and patients to falsely think that Plaintiff Chalifoux' professional services were somehow so egregiously improper and inadequate that a summary suspension was necessary to restrain him.

159.   Defendants knew that their statements disparaging Plaintiff Chalifoux were false.  In the alternative, to the extent that any of the Defendants did not know their statements were false, then those Defendants were negligent in

publishing them.

160.  Defendants' communications constituted libel *per se* by impugning the professional services and conduct of Plaintiff Chalifoux.

161.  Plaintiff Chalifoux is not a public figure.

162.  Despite being informed about the falsehoods in the statements about Plaintiff Chalifoux, Defendants have not retracted them.

163.  Defendants' defamatory statements were willful, wanton and malicious.

164.  As a direct and proximate result of the Defendants' Defamation, Plaintiff Chalifoux has and will suffer damages in the form of lost wages and earnings, loss of reputation, loss of earning capacity, increased medical malpractice premiums and other consequential damages as shall come to be learned through discovery.

165.  Plaintiff Chalifoux is entitled to recover punitive damages as a result of Defendants' willful, wanton and malicious defamation.

### Count IV
### (Civil Conspiracy)

166.  Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs,

as though fully set forth herein.

167.  Defendants, by their concerted actions as set forth hereinabove, to accomplish an unlawful purpose, as set forth hereinabove, or to accomplish a purpose, not itself unlawful, by unlawful means.

168.  The unlawful purpose was to engage in a restraint of trade in violation of Section 1 of the Sherman Act.

169.  The unlawful means was to violated Plaintiff Chalifoux' due process rights under the bylaws by engaging in a sham peer review process.

170.  All of the Defendants acted in concert by the facts set forth hereinabove to conduct a sham peer review of Plaintiff Chalifoux in violation of his due process rights as set forth in the bylaws of Defendant WCH to accomplish an unlawful restraint of trade in violation of Section 1 of the Sherman Act to eliminate Plaintiff Chalifoux from competition in the pain management market in the Ohio Valley market leaving Defendants WCH and WVU Health with nearly unfettered access to all pain management patients in the relevant market with either no or diminished competition.

171.  Defendants' conspiracy in this regard has caused harm and damages to Plaintiff Chalifoux in the form of lost wages and earnings, loss of reputation, loss of earning

capacity, increased medical malpractice premiums and other consequential damages as shall come to be learned through discovery.

### Count V
### (Tortious Interference)

172.  Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

173.  Plaintiff Chalifoux has contractual relationships with various health insurance providers to provide services to their customers who are his patients.

174.  Defendants, as set forth hereinabove, have intentionally interfered with Plaintiff Chalifoux' contractual relationship with those various health insurance providers by conducting a sham peer review which resulted in the summary suspension and subsequent termination of his privileges at Defendant WCH.

175.  The termination of Plaintiff Chalifoux' privileges at Defendant WCH based on the sham peer review and violation of his due process rights under the bylaws directly and proximately resulted in the termination of Plaintiff Chalifoux' contracts with one or more of those health insurance providers.

176.  Defendants' tortious interference in this regard has caused harm and damages to Plaintiff Chalifoux in the form of lost wages and earnings, loss of reputation, loss of earning capacity, increased medical malpractice premiums and other consequential damages as shall come to be learned through discovery.

177.  Plaintiff Chalifoux is entitled to recover punitive damages from Defendants for their intentional conduct that tortiously interfered with his contractual relationship with those various health care providers.

**WHEREFORE,** having set forth his Complaint, Plaintiff Roland F. Chalifoux, Jr., D.O., prays that the Court:

1.  Enter a monetary judgment in favor of the Plaintiff and against the Defendants for compensatory damages, attorney fees and costs incurred in filing and prosecuting this action and punitive damages as a result of Antitrust violations and violation of due process and Sham Peer Review, defamation, civil conspiracy and the bad faith, vexatious, willful, wanton, malicious, intentional, and oppressive conduct of the Defendants in failing and refusing to follow their bylaws, policies and procedures referenced herein and conducting a Sham Peer Review, as well as defamation of Plaintiff and acting in a civil conspiracy to do so; and

-63-

2.    Grant such further relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

ROLAND F. CHALIFOUX, JR.,
D.O.

By Counsel

s/Scott H. Kaminski
Scott H. Kaminski, Esq.
 (WV Bar No. 6338)
RAY, WINTON & KELLEY, PLLC
109 Capitol Street, Suite 700
Charleston, WV 25301
(304) 342-1141

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROLAND F. CHALIFOUX, JR., D.O.,

       Plaintiff,

v.                              Civil Action No. 5:22-cv-0313
                              Judge John Preston Bailey

WETZEL COUNTY HOSPITAL, INC.;
WEST VIRGINIA UNITED HEALTH SYSTEM, INC.,
d/b/a West Virginia University Health System or
WVU Health System; DONALD BLUM, M.D.;
NIRAJ MOHAN, M.D.; MATTHEW SOKOS, M.D.;
HANY TADROS, M.D.; SEAN SMITH; and
JESSICA HUFFMAN,

       Defendants.

## CERTIFICATE OF SERVICE

      I Scott H. Kaminski, counsel for Plaintiff, certify that the foregoing "First Amended Complaint" has been served on this 7th day of April, 2023 by via CM/ECF which shall send a copy to the following counsel of record:

Christine S. Vaglienti
Eugene A. Giotto (*Admitted Pro Hac Vice*)
West Virginia University Health System Legal Services
1238 Suncrest Towne Centre
Morgantown, WV 26505

                        s/Scott H. Kaminski
                        Scott H. Kaminski (WVSB #6338)

**BEFORE THE WEST VIRGINIA BOARD OF OSTEOPATHIC MEDICINE**

**WEST VIRGINIA BOARD OF OSTEOPATHIC MEDICINE,**
**Complainant,**

**v.**                                                            **Complaint No. 2022-30**

**ROLAND CHALIFOUX, D.O.,**
**Respondent.**

## ORDER OF DISMISSAL

After review of the above-numbered Complaint and other documents received, the West Virginia Board of Osteopathic Medicine renders the following decision:

## PROCEDURAL HISTORY

On September 27, 2022, the West Virginia Board of Osteopathic Medicine (hereinafter referenced as the "Board) issued Complaint Number 2022-30 against Roland Chalifoux, D.O. (hereinafter referenced as "Respondent"). The Board received a response to the Complaint, and a full review of the matter by the Board ensued.

## FINDINGS OF FACT

1.     Respondent possesses a Board-issued license to practice osteopathic medicine and surgery in West Virginia, License Number 2077.

2.     The Board initiated this matter to investigate Respondent's treatment of a patient during a pain pump trial.

3.     The Board reviewed the patient's medical records from this procedure.



1

4.      Respondent submitted an affidavit from a neurologist who opined that Respondent performed the procedure within the standard of care.

## CONCLUSIONS OF LAW

1.      Since the Complaint alleges unprofessional conduct by a licensee of the Board, the West Virginia Board of Osteopathic Medicine has jurisdiction over Respondent and the subject matter of the Complaint under the provisions of Chapter 30, Article 14, of the West Virginia Code.

2.      After thorough examination of the documentation, the Board does not find that Roland Chalifoux, D.O., failed to practice osteopathic medicine with that level of care, skill and treatment that would be recognized as acceptable by a reasonable and prudent physician, engaged in the same or similar specialty, under similar circumstances.

3.      Based upon a review of its record relating to Complaint Number 2022-30, the West Virginia Board of Osteopathic Medicine concludes that there is no basis for disciplinary action against Roland Chalifoux, D.O., for any reason under West Virginia Code § 30-14-11(a) and 24 CSR 1, § 18.1.

Therefore, the West Virginia Board of Osteopathic Medicine has determined that there is **NO PROBABLE CAUSE** to believe that Roland Chalifoux, D.O., acted unprofessionally or that he has demonstrated a lack of professional competence to practice medicine.  Pursuant to a vote of a majority of the members at a meeting of the Board, the Complaint against Roland Chalifoux, D.O., is hereby **DISMISSED.**

DATE ENTERED: _06 FEBRUARY 2023_

By: _____

Jimmy W. Adams, D.O.
President
West Virginia Board of Osteopathic Medicine